**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1424-16T1

JESSE D. SADEJ,

  Plaintiff,

and

CARLA SADEJ,

  Plaintiff-Appellant,

v.

ANTHONY X. ARTURI, JR., ESQ.,
BARRY S. GUAGLARDI, ESQ., and
ARTURI, D'ARGENIO, GUAGLARDI
& MELITI, LLP,

  Defendants-Respondents.

_____

    Argued March 7, 2019 – Decided May 7, 2019

    Before Judges Simonelli, Whipple and Firko.

    On appeal from Superior Court of New Jersey, Law
    Division, Bergen County, Docket No. L-2077-12.

Mitchell B. Seidman argued the cause for appellant (Seidman & Pincus, LLC, attorneys; Mitchell B. Seidman and Andrew J. Pincus, on the briefs).

Walter F. Kawalec, III, argued the cause for respondents (Marshall Dennehey Warner Coleman and Goggin, LLC, attorneys; Walter F. Kawalec, III, and Howard B. Mankoff, on the brief).

PER CURIAM

In this legal malpractice matter, plaintiff Carla Sadej appeals from various orders and a final judgment entered after a jury verdict in favor of defendants Barry S. Guaglardi, Esq. and Arturi, D'Argenio, Guaglardi & Meliti, LLP (collectively defendants). We affirm.

## I.

### The Underlying Action

In August 2001, plaintiff and her husband, Jesse Sadej (Sadej),[1] filed five pages of plans with the Borough of Seaside Park (Borough) outlining the scope of the improvements they sought to make on their eight-bedroom Victorian home. The improvements included expanding the house and existing detached garage, connecting the expanded garage to the house, and constructing an in-ground pool.

---

[1] Sadej was a plaintiff in this matter but does not appeal.

In August 2001, Borough zoning official Michael Marcinczyk issued a zoning approval notice for the improvements, and Borough Construction Code official James Erdman reviewed and approved the plans. Erdman initialed and dated each of the five pages of the plans, wrote the words "Inspector Job Copy" in red ink, attached the Building Department's red sticker on the first page of one set of plans, and gave that set of plans to Sadej to be kept on site. Erdman retained a copy of the plans for the Borough and issued a construction permit. Thereafter, the Sadejs obtained a mortgage to pay for the improvements and commenced construction in accordance with the approved plans.

Approximately eight months later, on April 17, 2002, Erdman issued a stop work order to the Sadejs for "lost zoning approval." At that point, the Sadejs had completed approximately eighty percent of the improvements at a cost of $268,219. The Sadejs did not stop the construction, and on April 18, 2002, the police escorted the contractors off the site.

On May 2, 2002, Borough Administrator Joseph J. Delaney, Jr. met with Sadej in Delaney's office. Delaney told Sadej that Erdman issued the stop work order because the construction did not conform to the plans the Borough had on file. Delaney also explained that the Borough's land use policy did not permit

connection of a detached garage to the main dwelling because the Borough was trying to discourage having renters in garages.

It is undisputed that the plans the Borough had on file differed from the set of plans Erdman gave to Sadej. The second, third, fourth, and fifth pages of the plan the Borough had on file did not have Erdman's initials and date notations on them, and the fifth page contained different wording and a different drawing regarding the expansion of the garage, connection of the garage to the house, and rear yard setback. Sadej told plaintiff that the Borough had "fraudulently altered" the plans and Delaney had threatened Sadej by stating that a contractor had gone bankrupt by challenging the Borough in litigation. The individual who altered the plans was not identified, and it was not determined whether the alteration was an intentional fraud or an innocent mistake.

In any event, on May 8, 2002, the Borough filed a verified complaint and order to show cause in the Chancery Division seeking to restrain the Sadejs from any further construction, compel them to dismantle the improvements already made without valid permits or approvals, and pay the Borough's attorney's fees and costs. Relying on the altered plans, the Borough alleged that the Sadejs had "substantially increased the scope, intensity, use and character" of the improvements "from that which was shown on the original permitted plans.

4

Specifically, it appears that the work that is being conducted may violate Borough setback, height, area and lot coverage [but not building coverage] requirements of its zoning ordinance." Further, Erdman alleged in a supporting certification that the Sadejs had "substantially deviated from the plans submitted as part of the original construction permit." Erdman attached a copy of the altered plans, but not the original plans, to his certification.

On May 9, 2002, the court issued an order temporarily restraining the Sadejs from any further construction. That same day, Sadej sent a letter to Delaney, the Borough mayor and council, and the police chief alleging his plans had been fraudulently altered to support the Borough's position that the Sadejs' construction activities constituted building code and zoning violations.

The Sadejs retained defendants to represent them in the underlying action. In a May 16, 2002 order, the court granted the Sadejs' application to lift the temporary restraints, but advised them "that any continued construction on the site shall proceed at [their] peril."

Approximately one year later, on May 28, 2003, defendants, on the Sadejs' behalf, filed an answer to the Borough's complaint and asserted separate defenses, including promissory and equitable estoppel. The Sadejs also asserted a counterclaim against the Borough for declaratory judgment, promissory

estoppel/detrimental reliance and fraud. Defendants did not file a notice of tort claim with the Borough pursuant to the New Jersey Tort Claims Act, N.J.S.A. 59:1-1 to 12-3. The Borough filed an answer to the counterclaim and asserted separate defenses, including the two-year statute of limitations (SOL) and the Sadejs' failure to file a notice of tort claim.

On October 3, 2003, the Sadejs filed an amended answer, affirmative defenses, and an amended counterclaim reasserting claims against the Borough for declaratory judgment and promissory estoppel/detrimental reliance, and adding a claim under 42 U.S.C. § 1983 for the deprivation of their property rights. The Sadejs did not reassert a fraud claim.

In three separate May 10, 2004 orders, the court granted the Sadejs' motion for partial summary judgment, finding the improvements did not violate the Borough's zoning ordinance regarding building height, rear yard setback, and side yard setback. However, the judge also granted the Borough's motion for partial summary judgment, finding the improvements violated the building coverage zoning ordinance – a violation the Borough did not assert in its complaint. The court found the building, which it determined included the existing attached porch, violated the maximum allowable building coverage.

A-1424-16T1

The court ordered the building coverage zoning violation to proceed to trial along with the Sadejs' separate defenses and counterclaim.

On May 13, 2004, five days after the SOL expired, the Sadejs filed a second amended counterclaim against the Borough and a third-party complaint against the Borough's mayor and council, Erdman, Marcinczyk, and Delaney, both individually and as municipal officials, for declaratory judgment, estoppel, violation of 42 U.S.C. § 1983, fraud, malicious prosecution, and malicious abuse of process.

The Borough and municipal officials filed a motion for summary judgment and to dismiss the second amended counterclaim and third-party complaint based on the SOL and the Sadejs' failure to file a notice of tort claim. Thereafter, on July 9, 2004, the Sadejs filed a notice of tort claim with the Borough.

The case was transferred to the Law Division, where the court granted the motion and dismissed the second amended counterclaim and third-party complaint with prejudice. The court found the asserted causes of action were barred by the two-year SOL because they accrued prior to May 9, 2002, the date of both Sadej's letter to Delaney, and the Borough mayor, council and police

A-1424-16T1

chief and the date the Chancery court issued the restraining order. The court also found the Sadejs failed to timely file a notice of tort claim with the Borough.

The court subsequently denied the Sadejs' motion for reconsideration making the additional finding that the Sadejs failed to establish a prima facie case of malicious prosecution. The court determined the only remaining issue for trial was whether the Borough was estopped from enforcing the building coverage zoning violation.

The Sadejs subsequently moved for summary judgment, arguing the Borough was estopped from enforcing the building coverage zoning violation because they had, in good faith, relied on the building permit and zoning approvals issued by the Borough in making the improvements. The court granted the motion and dismissed the Borough's complaint. The court found the Borough was estopped from enforcing the building coverage zoning violation in light of the court's earlier ruling permitting the Sadejs to make the improvements to the garage as a pre-existing nonconforming use. The court explained that the Borough was estopped from arguing that the Sadejs had to remove the existing porch because "[the Borough], in essence, permitted [the Sadejs] to build a garage which caused the [building] coverage problem." Thus, the court ordered the Borough to immediately reissue the building permit and zoning approvals,

 A-1424-16T1

and authorized the Sadejs to complete the improvements without any further permits or approvals from the Borough.

The Sadejs filed a motion to for frivolous litigation sanctions under the Frivolous Litigation Statute, N.J.S.A. 2A:15-59.1, alleging the Borough filed its complaint despite knowing the fraudulent nature of the building plans on which it relied. The court denied the motion finding that municipalities are not subject to liability under the statute.

The parties appealed from various orders. We affirmed the dismissal of the Sadejs' fraud claims against the municipal officials as time-barred under the SOL and the dismissal of their claims against the Borough for failure to timely file a notice of tort claim. Borough of Seaside Park v. Sadej, No. A-6596-06 (App. Div. July 17, 2009) (slip op. at 22-23). However, we reversed the dismissal of the malicious abuse of process claim against the municipal officials, finding it was timely because the claim did not accrue until June 9, 2007, when the court entered the order granting the Sadejs' motion for summary judgment. Ibid. Nonetheless, we affirmed the dismissal of the malicious prosecution claim against the Borough, not for failure to timely file a notice of tort claim, but because a municipality cannot entertain malice as a public corporation. Id. at 18.

We also reversed and remanded the frivolous litigation sanction issue to the trial court for consideration of whether the Sadejs complied with the safe harbor provision of Rule 1:4-8(b)(1). Id. at 42. We directed the court to conduct a practicality analysis as to whether the circumstances require strict adherence to Rule 1:4-8, and consider whether the Borough's conduct fell within the statutory definition of frivolous in N.J.S.A. 2A:15-59.1(b). Ibid. We also directed that if the court found, after consideration of the above issues, that the Sadejs were entitled to a frivolous litigation counsel fee award against the Borough, the court should revisit the question of whether the Borough was immune from liability. Ibid.

The Sadejs retained a new attorney to represent them on remand. Their malicious abuse of process claim against the municipal officials was tried before a jury. At the conclusion of the trial, but before the jury announced the verdict, they accepted a settlement offer of $125,000, apparently with the understanding that they would pursue a legal malpractice action against defendants.

The Malpractice Action

The trial in the malpractice action began in August 2016. By that time, the Sadejs were divorced and plaintiff had received the property in equitable distribution. See Sadej v. Sadej, No. A-2347-10 (App. Div. May 16, 2012) (slip

10

op. at 11). Plaintiff testified at the trial as to her damages, but Sadej did not testify.

Plaintiff's expert, William Michelson testified that defendants deviated from the standard of care in failing to: (1) timely file a notice of tort claim as to the counterclaim against the Borough for promissory estoppel; (2) timely assert claims against the municipal officials for declaratory judgment, estoppel, and deprivation of property rights under 42 U.S.C. § 1983; and (3) assert claims against the Borough and municipal officials for inverse condemnation and deprivation of property rights under the United States and State Constitutions. Michelson conceded, however, that there was no viable basis for the Sadejs' fraud claim.

Michelson opined that the Sadejs would have been successful in pursuing the above claims. Regarding the claims for deprivation of property rights under the United States and State Constitutions, he testified there was a viable claim for a partial taking and for interference with the enjoyment of the Sadejs' property. He explained that the Borough's action violated the Sadejs' "rights, it was a taking, a partial taking or temporary taking, of their property interest and it's also been described as an estoppel." He opined that damages included the

11

stop work order, the demand to dismantle the completed improvements, and the length of time the Sadejs could not proceed with the work.

Michelson also asserted that the dismissal of these claims was the proximate cause of the Sadejs' damages. He explained that if the claims had not been dismissed, the jury in the underlying action would have returned a verdict in the Sadejs' favor and they would have had a stronger case, which would have been reflected in the verdict or settlement. He admitted, however, that "[n]obody could know" whether the Sadejs would have actually achieved a verdict in excess of $125,000, or would have been able to negotiate a higher settlement. He also admitted that on remand, the Sadejs could have recovered damages for loss of rent and emotional distress, counsel fees, and punitive damages under the malicious abuse of process claim.

Lastly, Michelson opined that defendants deviated from the standard of care in failing to serve a "Safe Harbor" notice under Rule 1:4-8(b)(1) in pursuing their claim for frivolous litigation sanctions against the Borough. Michelson testified that this deviation proximately damaged the Sadejs because it made it impossible for them to recover the approximately $287,000 in counsel fees they incurred in the underlying action.

A-1424-16T1

Defendants' malpractice expert, Brian Molloy, conceded that defendants deviated from the standard of care in failing to timely file a notice of tort claim and in failing to timely file the counterclaim. However, he opined that these deviations did not proximately cause the Sadejs any damages because on remand they were able to pursue both their claim for malicious abuse of process against the municipal officials and their claim for frivolous litigation sanctions. He explained that the same conduct (the Borough filing suit based on the altered plans) gave rise to different causes of action, and the Sadejs could not recover double damages.

Defendants' land use expert, Steven Tripp, opined that the Sadejs did not have a viable claim for a temporary taking because they were able to use the property throughout the underlying litigation.

The jury found that the Sadejs proved defendants deviated from the applicable standard of care by not timely filing affirmative claims against the Borough or municipal officials for promissory estoppel, violation of 42 U.S.C. § 1983, and violation of the Sadejs' property rights under the State Constitution. However, the jury found the deviations did not proximately cause the Sadejs to suffer damages.

13

On August 26, 2016, the court entered final judgment in defendants' favor and dismissed the complaint with prejudice.  On November 9, 2016, the court entered an order denying the Sadejs' motion for a new trial on damages and causation or for judgment notwithstanding the verdict (JNOV).  This appeal followed.

II.

The Sadejs moved prior to the malpractice trial for partial summary judgment on their claim that defendants committed malpractice by failing to timely file a notice of tort claim as to the claim against the Borough in the underlying action for promissory estoppel.  At the close of all evidence, the Sadejs moved for judgment under Rule 4:40-1 on liability and damages on their claim that defendants committed malpractice in failing to timely prosecute their claim against the Borough for promissory estoppel.

In denying the motion for partial summary judgment, the court found that although the Sadejs were successful in pursuing an estoppel defense in the underlying action, this did not mean they would have succeeded on the affirmative promissory estoppel claim, particularly on the issue of proximate cause. The court also found it was a jury question as to what the Sadejs' success on the estoppel defense meant in terms of causation and damages on the

affirmative promissory estoppel claim. In denying the motion for judgment under Rule 4:40-1, the court held that the liability and damages issues should go to the jury.

On appeal, plaintiff contends that the court erred in denying the motions. Despite the jury verdict in the malpractice action, she argues that because she was successful on her estoppel defense in the underlying action, it follows that she would also have been successful under those same factual circumstances on the affirmative promissory estoppel claim. We disagree.

Our review of a ruling on summary judgment is de novo, applying the same legal standard as the trial court. Conley v. Guerrero, 228 N.J. 339, 346 (2017). Thus, we consider, as the trial judge did, "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Liberty Surplus Ins. Corp. v. Nowell Amoroso, P.A., 189 N.J. 436, 445-46 (2007) (quoting Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 536 (1995)). Summary judgment must "be granted 'if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law.'" Templo Fuente De Vida

Corp. v. Nat'l Union Fire Ins. Co., 224 N.J. 189, 199 (2016) (quoting R. 4:46-2(c)).

"To defeat a motion for summary judgment, the opponent must 'come forward with evidence that creates a genuine issue of material fact.'" Cortez v. Gindhart, 435 N.J. Super. 589, 605 (App. Div. 2014) (quoting Horizon Blue Cross Blue Shield of N.J. v. State, 425 N.J. Super. 1, 32 (App. Div. 2012)). "If there is no genuine issue of material fact, we must then 'decide whether the trial court correctly interpreted the law.'" DepoLink Court Reporting & Litig. Support Servs. v. Rochman, 430 N.J. Super. 325, 333 (App. Div. 2013) (quoting Massachi v. AHL Servs., Inc., 396 N.J. Super. 486, 494 (App. Div. 2007)). We review issues of law de novo and accord no deference to the trial judge's legal conclusions. Nicholas v. Mynster, 213 N.J. 463, 478 (2013).

Under Rule 4:40-1, "[a] motion for judgment . . . may be made by a party . . . at the close of the evidence offered by an opponent." The standard of review is the same as that for a motion for Rule 4:37-2(b) involuntary dismissal and Rule 4:40-2 JNOV. Pressler & Verniero, Current N.J. Court Rules, cmt. 1 on R. 4:40-2 (2019).

In deciding the motion, the court "must accept as true all evidence supporting the position of the party defending against the motion and must

accord that party the benefit of all legitimate inferences which can be deduced [from the evidence]." Besler v. Bd. of Educ. of W. Windsor-Plainsboro Reg'l Sch. Dist., 201 N.J. 544, 572 (2010) (alteration in original) (quoting Lewis v. Am. Cyanamid Co., 155 N.J. 544, 567 (1998)). If reasonable minds could reach different conclusions, the motion must be denied. Rena, Inc. v. Brien, 310 N.J. Super. 304, 311 (App. Div. 1998). If the evidence is so one-sided, however, that one party must prevail as a matter of law, then a directed verdict is appropriate. Frugis v. Bracigliano, 177 N.J. 250, 270 (2003). The trial judge may not consider issues of witness credibility in making the determination. See Rena, 310 N.J. Super. at 311. We utilize the same standard as the trial court. Frugis, 177 N.J. at 269. Applying the above standards, we discern no reason to reverse.

To establish a claim of legal malpractice, the plaintiff must prove: (1) the existence of an attorney-client relationship creating a duty of care upon the attorney; (2) the breach of that duty; and (3) damages proximately caused by that breach. Conklin v. Hannoch Weisman, 145 N.J. 395, 416 (1996) (quoting Lovett v. Estate of Lovett, 250 N.J. Super. 79, 87 (Ch. Div. 1991)). There is no dispute that the first two elements were met here. At issue is the third element, proximate causation.

It is well established that "[t]he issue of causation is ordinarily left to the factfinder." Townsend v. Pierre, 221 N.J. 36, 59 (2015). It may, however, "be removed from the factfinder in the highly extraordinary case in which reasonable minds could not differ on whether that issue has been established." Id. at 60 (quoting Fluehr v. City of Cape May, 159 N.J. 532, 543 (1999)). Here, reasonable minds clearly differed in that ultimately the jury found the Sadejs failed to establish the third element. That finding by the jury, which is amply supported by the credible evidence, forecloses plaintiff's argument on appeal that the judge erred in denying the motion for partial summary judgment.

For the sake of completeness we address additional reasons why the denial of partial summary judgment was proper. "Where . . . the claim of malpractice alleges a failure to meet a time-bar, 'a client must establish the recovery which the client would have obtained if malpractice had not occurred.'" Garcia v. Kozlov, Seaton, Romanini & Brooks, P.C., 179 N.J. 343, 358 (2004) (quoting Frazier v. N.J. Mfrs. Ins. Co., 142 N.J. 590, 601 (1995)). "For example, if a lawyer misses a statute of limitations and a complaint is dismissed for that reason, a plaintiff must still establish that had the action been timely filed it would have resulted in a favorable recovery." Conklin, 145 N.J. at 417. "The most common way to prove the harm inflicted by such malpractice is to proceed

by way of a 'suit within a suit' in which a plaintiff presents the evidence that would have been submitted at a trial had no malpractice occurred." Garcia, 179 N.J. at 358. That "approach aims to clarify what would have taken place but for the attorney's malpractice." Ibid.

Ordinarily, the measure of damages is what result the client would have obtained in the absence of attorney negligence. Ibid. To prove such injury, "the client must demonstrate that he or she would have prevailed, or would have won materially more . . . but for the alleged substandard performance." Lerner v. Laufer, 359 N.J. Super. 201, 221 (App. Div. 2003). "When plaintiff has settled the underlying action, the measure of damages is the difference between the settlement and the amount of money that would have been obtained by judgment." Kranz v. Tiger, 390 N.J. Super. 135, 146 (App. Div. 2007).

Plaintiff argues it was error to deny her motion because it was a "foregone conclusion" that she would have prevailed on the affirmative promissory estoppel claim based on the success she achieved on the estoppel defense. However, the court in the underlying action did not, as plaintiff argues, adjudicate the estoppel defense on the same basis as an affirmative claim for promissory estoppel.

The Sadejs had obtained approvals to construct improvements to the existing main dwelling and garage. The record does not show the Sadejs sought to make any improvements to the existing porch. Based on the altered plans, the Borough issued a stop work order and brought suit against the Sadejs alleging that the work violated the setback, height, area and lot coverage requirements of the zoning ordinance. The court in the underlying action granted the Sadejs' motion for partial summary judgment, not on the basis of estoppel, but because the court found there was no building height, rear yard and side yard setback zoning violations. The court also granted the Borough's motion for partial summary judgment finding the building, which included the expanded garage and the porch, exceeded the allowable building coverage.

Thereafter, the court found the Borough was estopped from enforcing the remaining claim for a building coverage zoning violation, not because the Sadejs had relied on the Borough's permits and approval in making the improvements, but rather in light of the court's prior ruling permitting the improvements to the garage as a pre-existing nonconforming use. Thus, the court did not, as plaintiff argues, apply "the critical elements of the defense [of] equitable estoppel to the facts and circumstances of the Borough's conduct" and therefore it was not a

"foregone conclusion" that if properly filed the Sadejs would have been successful on their affirmative promissory estoppel claim.

Further, equitable estoppel, asserted as a defense in the underlying action, is a distinct legal concept from promissory estoppel, asserted as an affirmative claim in the counterclaim. See Segal v. Lynch, 211 N.J. 230, 253-54 (2012) (differentiating between promissory and equitable estoppel). "Estoppel" is listed as an affirmative defense under Rule 4:5-4. The doctrine of equitable estoppel "is designed to prevent injustice by not permitting a party to repudiate a course of action on which another party has relied to his detriment." Knorr v. Smeal, 178 N.J. 169, 178 (2003). The doctrine "is based on the principles of fairness and justice." D'Agostino v. Maldonado, 216 N.J. 168, 200 (2013).

"To establish equitable estoppel, parties must prove that an opposing party 'engaged in conduct, either intentionally or under circumstances that induced reliance, and that [they] acted or changed their position to their detriment.'" Hirsch v. Amper Fin. Servs., LLC, 215 N.J. 174, 189 (2013) (alteration in original) (quoting Knorr, 178 N.J. at 178). "Equitable estoppel may be invoked against a municipality 'where interests of justice, morality and common fairness clearly dictate that course.'" Middletown Twp. Policemen's Benevolent Ass'n

21

Local No. 124 v. Twp. of Middletown, 162 N.J. 361, 367 (2000) (quoting Gruber v. Mayor & Twp. Comm. of Raritan, 39 N.J. 1, 13 (1962)).

Our courts "have applied equitable estoppel to prevent municipalities from revoking valid permits or approvals from builders who had justifiably relied on those permits or approvals to their substantial detriment." Palatine I v. Planning Bd. of Montville, 133 N.J. 546, 560 (1993). Nonetheless, the doctrine is "rarely invoked against a governmental entity." Twp. of Middletown, 162 N.J. at 367 (quoting Wood v. Borough of Wildwood Crest, 319 N.J. Super. 650, 656 (App. Div. 1999)).

In contrast, promissory estoppel is often asserted as a claim or counterclaim, although it can be asserted as an affirmative defense. See Pop's Cones, Inc. v. Resorts Int'l Hotel, Inc., 307 N.J. Super. 461, 469 (App. Div. 1998) (asserting claim for promissory estoppel seeking monetary damages). To establish promissory estoppel, the plaintiff must "show that there has been '(1) a clear and definite promise; (2) made with the expectation that the promisee will rely on it; (3) reasonable reliance; and (4) definite and substantial detriment.'" Segal, 211 N.J. at 253 (quoting Toll Bros., Inc. v. Bd. of Chosen Freeholders of Burlington, 194 N.J. 223, 253 (2008)).

To that end, the doctrines of equitable estoppel and promissory estoppel differ, in that "[e]quitable estoppel does not require a definite promise, but may be invoked when there is 'conduct, either express or implied, which reasonably misleads another to his prejudice so that a repudiation of such conduct would be unjust in the eyes of the law.'" Id. at 254 (quoting McDade v. Siazon, 208 N.J. 463, 480 (2011)). It was thus not a "foregone conclusion" that the Sadejs would have been successful on their affirmative promissory estoppel claim because the basis for the estoppel defense in the underlying action differed both factually, as set forth above, and legally from the affirmative promissory estoppel claim.

Lastly, and significantly, not only are the doctrines legally distinct, but the types of proof required to assert a defense of equitable estoppel and/or promissory estoppel is different than the proofs required to assert an affirmative promissory estoppel claim for money damages based on the doctrines. Notably, in asserting a counterclaim against the Borough, the Sadejs had to prove they incurred damages by reasonably relying to their detriment on the Borough's promise (promissory estoppel) or the Borough's conduct (equitable estoppel). See Pop's Cones, 307 N.J. Super. at 472. The Sadejs presented no proofs as to damages, nor did they move for summary judgment on that basis, because they were asserting the equitable doctrine as a defense, not as an affirmative claim.

23

Thus, even if the court in the underlying action had found the Borough was estopped from enforcing the building coverage zoning violation based on the issuance of the permits and approval, it would not follow that the Sadejs were entitled to judgment in the malpractice action.

Moreover, as the court in the malpractice action properly found, there was a genuine issue of material fact as to whether defendants' conduct was a proximate cause of economic damages sustained by the Sadejs. In fact, the jury later found the Sadejs failed to meet their burden of proof on this issue—a verdict amply supported by the evidence. The Sadejs were required to establish that if defendants had timely filed a notice of tort claim as to their affirmative promissory estoppel claim, the Sadejs would have been able to settle the underlying action for more than $125,000. They failed to do so.

However, it was undisputed that the Sadejs were barred only from completing the improvements for seven days and were not compelled to remove any of the completed improvements. They also were not deprived of the use of the property in that, during the course of the litigation they used the home for family vacations as planned, completed the majority of the improvements, refinanced the home for $1.2 million, and received $110,400 in rental income even though they had not intended to rent out the property. At best, the Sadejs

24

established that they completed some of the improvements at their "peril," and did not complete the improvements to the garage; however, there was no evidence as to how much value the improvement to the garage would have added to the property or how the Sadejs intended to use the improved space. Thus, the court did not err in denying the motion for partial summary judgment because the facts supported a verdict in defendants' favor. For all of these reasons, the court also did not err in denying plaintiff's motion for judgment under Rule 4:40-1.

## III.

Plaintiff contends as plain error that the court erred in charging the jury on the issue of "taking" without compensation in violation of the United States and State Constitutions. She argues the charge misstated the law and defendants waived their right to the charge and abandoned the issue of a partial taking. She also argues the court erred in denying the motion for a new trial on this basis. We reject these arguments.

Prior to the trial in the malpractice action, the parties each submitted proposed jury charges. Neither party included a proposed charge on partial taking. Thereafter, the issue of whether the Borough's actions constituted a partial taking evolved during the course of the trial. For example, plaintiff

25

sought to admit an appraiser's testimony as to the value of the property in November 2011 ($1.29 million) and April 2015 ($1.134 million), in support of her claim of a complete taking, and as to the amount of rental income she could have received between 2002 and 2007, in support of her partial taking claim.

Defendants objected based on relevancy because plaintiff did not lose the entire value of the property, and based on hearsay because the appraiser simply stated in his report that "he called around to a bunch of different realtors" to ascertain how much rental income plaintiff could derive from the property. Plaintiff's counsel admitted, "there wasn't a full loss of value" in this case but argued he wanted to elicit testimony from the appraiser as to the loss of value in measuring damages.

The court barred the appraiser from testifying as to the value of the property in 2011 and 2015 based on relevancy, barred the appraiser from testifying as to the rental value based on hearsay, and dismissed plaintiff's claim that there was a complete taking of the property. However, the court permitted plaintiff to call realtors to testify as to the rental values. Plaintiff did not call any realtors and instead relied on her own testimony as to the rents she received in 2009, 2014, and 2015.

At the close of plaintiff's case, the court denied defendants' motion to dismiss the loss of rent claim. The court found that although plaintiff testified she did not intend to lease the property, that was not the end of the inquiry, as the issue was not whether she intended to lease, but rather the damages for a partial taking should be measured. The court noted that case law indicated a determination can be made by looking at the difference in the rental value with and without the carriage house and/or garage, and the jury would have to make that determination.

At the close of all evidence, the court granted defendants' motion to dismiss the Sadejs' claim that defendants deviated from the standard of care in failing to pursue a claim against the Borough for inverse condemnation. However, the court denied defendants' motion to dismiss the claim that they deviated in failing to timely file a notice of tort claim as to the 42 U.S.C. § 1983 and State constitutional takings claims. The judge found that an inverse condemnation claim

> requires more than simply a partial taking. I think it requires . . . a taking of substantially all of the property and in this case there seems to be no dispute . . . that there was not . . . a taking of substantially all of the property. . . . [I]f there was a taking, it was only with respect to the garage, and . . . I don't mean to minimize it but I don't think it rises to the level of inverse condemnation.

The court conducted an informal charge conference on August 15, 2016. On August 16, 2016, immediately prior to closing arguments, defense counsel asked the court to charge the jury on a partial temporary taking "as to the elements necessary to prove that claim, both for liability and damages." The Sadejs' counsel responded he had "no substantive objection to it, so that if [defense counsel] wants to write something up, [he'll] be glad to consider it."

That same morning, defense counsel submitted the following request to charge, which the Sadejs' counsel, but not the court, reviewed prior to closing arguments:

> There is a claim for a partial temporary taking. This is the basis of the [42 U.S.C. § 1983] claim and the [S]tate constitutional claims. To prove that there was a temporary partial taking, you must find that [plaintiffs] were deprived of all or substantially all of the beneficial use of the property. This is not limited to the addition [the garage]. It refers to all of the property.
>
> Just compensation for a temporary partial taking must be based on the fair market value of the owners' loss, calculated by looking at the difference between the value of the property before and after the taking.

During closing arguments, defense counsel stated that the Sadejs had to prove they had been "deprived of all or substantially all of the economic value of the property during the time at issue here[,]" and argued that they presented

28

no evidence as to "the difference in the value before and after the temporary taking," or the loss of rent. The Sadejs' counsel objected and requested a curative instruction. The judge issued a curative instruction that defense counsel's view of the law may not be accurate, and that the court would instruct the jury on the law.

During closing argument, the Sadejs' counsel argued they were entitled to an award "for the temporary partial taking of their property." Counsel maintained that lost rent was "just a mechanism to measure the loss of use of the property whether it's a complete taking or a partial taking. . . ." He argued that the jury

> should award some amount for loss of use, lost rent, only for the five years while they were living in peril of having to dismantle. Once the [B]orough's case was over, we do not contend that there are any damages that should be awarded in this trial for that. So, for loss use/rent . . . I'm just going to note the rent amounts . . . which is [in] . . . the range of $5,000 [per week] until it got up to $7400 [per week].
>
> And it's up to you as jurors to do the allocation to the extent you find it appropriate as to what portion of the rent is attributable to the portion of the house that they lost the use of. Whatever allocation you feel is or is not appropriate, you should do. And then based on that, you have the numbers to do the calculation. . . . [The house] was rented on a weekly basis throughout the season, during the season when it was rented. And

so, we ask you do that calculation for five years that they lived in peril of having to dismantle.

After closing argument, the court overruled defendants' request to charge, and instead, based on the factors set forth in <u>Penn Central Transportation Company v. City of New York</u>, 438 U.S. 104, 124-26 (1978), as adopted in <u>Mansoldo v. State of New Jersey</u>, 187 N.J. 50, 58 (2006), proposed to charge as follows:

> This is a claim for a partial temporary taking. This is the basis of the [42 U.S.C. §] 1983 claim and the [S]tate constitution . . . claims. To prove that there was a temporary partial taking plaintiffs must show that there was a diminishment in the rental value of the property during the period from April 2002 to July 2007. Just compensation for a partial temporary taking can be based upon the difference in rental value of the property both with and without the carriage house. You . . . are to determine if the plaintiffs have shown the difference in the rental value.

The Sadejs' counsel had no objection and said the charge was satisfactory.

Defense counsel objected, stating:

> rental value is not a measure of the damages in a partial taking. The jury should be instructed that to measure the damages in a partial temporary taking there needs to be testimony which would have established the value of the property before the partial taking and during the temporary taking. The jury should be further instructed that no such evidence was offered.

30

The court overruled the objection, acknowledging that it had barred the appraiser from testifying as to the fair market value of the property as of particular dates. Thereafter, the court charged the jury without objection as follows:

> Plaintiffs specifically claim that the Borough or its officials violated their Fifth Amendment Right by taking plaintiffs' property without just compensation and violated their [Fourteenth] Amendment Rights by depriving them of their property without due process of law.
>
> This is a claim by the plaintiff for a partial temporary taking . . . .
>
> To prove that there was a temporary partial taking plaintiffs must show that there was a diminishment in the rental value of their property during the time period from April 2002 to July 2007. Just compensation for a partial temporary taking can be based upon the difference in the rental value of the property both with and without a carriage house or garage that has been described in this case.
>
> . . . .
>
> Plaintiffs have the burden of proving compensatory damages by a preponderance of the evidence. Plaintiffs claim the following items of damages under [42 U.S.C. § 1983]: [t]he emotional and mental harm to plaintiffs during and after the events at issue including fear, humiliation, and mental anguish from April 2002 to Jul[y] 2007. . . . The reasonable value of the medical and psychological care and supplies that the plaintiff Carla Sadej reasonably

needed and actually obtained.  The reasonable value of the [deprivation] of plaintiffs' property from April 2002 until July of 2007.  And the reasonable value of the legal services . . . .

During deliberations, the jury initially submitted two questions: (1) "Do we have to determine 'partial taking' of property before considering punitive damages against Borough officials?" and (2) "[I]s showing diminishment in rental value the only way to prove 'temporary taking?'"  In response, the Sadejs' counsel said that the court should give no further instruction other than to refer the jury to the written jury instructions.  Defense counsel argued that in response to question two, the jury should be told "yes," because "that's the only measurement of temporary taking we've given them." The court agreed with the Sadejs' counsel and instructed the jury to refer to the written charge.

The jury then asked: "[M]ust the plaintiff have shown explicit diminished rental value of the property [under the instruction regarding the 42 U.S.C. § 1983 claim] or may we the jury use inference [as set forth in the general charge]. . . combined with evidence?"  The court advised the jury that they could draw inference as to the diminished rental value so long as such inferences were drawn from some evidence in the case.  The Sadejs' counsel agreed with the response and defendants' counsel objected, which objection was overruled.

32

In denying the Sadejs' motion for a new trial, the court rejected their argument that the jury charge was erroneous, finding it was only after the jury returned a verdict in defendants' favor that they raised alleged errors in the charge. The court further found the charge accurately described the requirements of a temporary partial taking consistent with Mansoldo and Penn Central, and the evidence presented during the trial.

"It is fundamental that '[a]ppropriate and proper charges to a jury are essential for a fair trial.'" Prioleau v. Ky. Fried Chicken, Inc., 223 N.J. 245, 256 (2015) (alteration in original) (quoting Velazquez ex rel. Velazquez v. Portadin, 163 N.J. 677, 688 (2000)). "[T]he jury charge should set forth in clear understandable language the law that applies to the issues in the case." Toto v. Ensuar, 196 N.J. 134, 144 (2008). "To accomplish these goals, the jury charge should be tailored to the specific facts of the case." Estate of Kotsovska ex rel. Kotsovska v. Liebman, 221 N.J. 568, 591-92 (2015). "As a general rule, [we] will not disturb a jury's verdict based on a trial court's instructional error 'where the charge, considered as a whole, adequately conveys the law and is unlikely to confuse or mislead the jury, even though part of the charge, standing alone, might be incorrect.'" Wade v. Kessler Inst., 172 N.J. 327, 341 (2002) (quoting Fischer v. Canario, 143 N.J. 235, 254 (1996)).

The Sadejs waived their right to challenge the charge on appeal because they did not object to it below. R. 1:7-2. "Where there is a failure to object, it may be presumed that the instructions were adequate." State v. Morais, 359 N.J. Super. 123, 134-35 (App. Div. 2003). "The absence of an objection to a charge is also indicative that trial counsel perceived no prejudice would result." Id. at 135.

In fact, not only did the Sadejs fail to object, they also expressly agreed with the instruction and asked the court to repeat it in response to the jury question. Under the invited error doctrine, "trial errors that 'were induced, encouraged or acquiesced in or consented to by defense counsel ordinarily are not a basis for reversal on appeal. . . .'" State v. Bailey, 231 N.J. 474, 490 (2018) (quoting State v. A.R., 213 N.J. 542, 561 (2013)).

Moreover, even if not waived, plaintiff is not entitled to relief on appeal unless she can show plain error, that is, error "capable of producing an unjust result . . . ." R. 2:10-2. For a jury charge, "plain error is 'legal impropriety in the charge prejudicially affecting the substantial rights of the [party] and sufficiently grievous to justify notice by the reviewing court and to convince the court that of itself the error possessed a clear capacity to bring about an unjust result.'" Mason v. Sportsman's Pub, 305 N.J. Super. 482, 495 (App. Div. 1997)

A-1424-16T1

(quoting State v. Hock, 54 N.J. 526, 538 (1969)).  The failure to provide clear and correct jury charges "may constitute plain error."  Das v. Thani, 171 N.J. 518, 527 (2002).

"The first step in assessing the sufficiency of a contested jury charge . . . requires an understanding of the legal principles pertinent to the jury's determination."  Estate of Kotsovska, 221 N.J. at 592.  At issue here is whether the Borough's issuance of a stop work order and an action to enforce it, after it had issued the permits and approvals, constituted a taking of private property without just compensation in violation of the Federal and State Constitutions.  See U.S. Const. amend. V ("[N]or shall private property be taken for public use, without just compensation."); N.J. Const. art. I, ¶ 20 ("Private property shall not be taken for public use without just compensation.").  "The New Jersey Constitution provides protections against governmental takings of private property without just compensation, coextensive with the Takings Clause of the Fifth Amendment of the United States Constitution."  Klumpp v. Borough of Avalon, 202 N.J. 390, 405 (2010).  The Takings Clause requires the government to compensate the property owner where a taking occurs.  Ibid.

A constitutional taking can occur by either a regulatory taking, as in this case, or a "physical taking, in which the government takes title to private property. . . ." Ibid.

> When the government physically takes possession of an interest in property for some public purpose, it has a categorical duty to compensate the former owner, regardless of whether the interest that is taken constitutes an entire parcel or merely a part thereof. Thus, compensation is mandated when a leasehold is taken and the government occupies the property for its own purposes, even though that use is temporary.
>
> [Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency, 535 U.S. 302, 322 (2002) (citation omitted).]

Deciding whether a regulatory taking has occurred is more "complicated. . . . As Justice Holmes stated, 'while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking.'" Mansoldo, 187 N.J. at 58 (quoting Pa. Coal Co. v. Mahon, 260 U.S. 393, 415 (1922)). "'One example of a governmental regulation that has been held to go 'too far' is 'where [the] regulation denies all economically beneficial or productive use of [the] land.'" Ibid. (alterations in original) (quoting Lucas v. S.C. Coastal Council, 505 U.S. 1003, 1015 (1992)). "Regulatory takings are fact-sensitive, and the landowner has the burden of establishing that the regulations have destroyed all

economically viable use of the property." Moroney v. Mayor & Council of Old Tappan, 268 N.J. Super. 458, 463 (App. Div. 1993) (citation omitted).

However, if, as here, "the regulation does not deny all economically beneficial use under Lucas, then the determination whether the regulation otherwise constitutes a compensable taking is governed by the standards set forth in [Penn Central, 438 U.S. at 124]." Mansoldo, 187 N.J. at 59. Under that analysis, "Penn Central provides '[a]n ad hoc factual inquiry . . . for regulatory action that diminishes but does not destroy the value of property by restricting its use.'" Ibid. (alteration in original) (quoting Bronco Wine Co. v. Jolly, 29 Cal. Rptr. 3d 462, 497 (Ct. App. 2005)). The Penn Central factors include: (1) "[t]he economic impact of the regulation on the claimant"; (2) "the extent to which the regulation has interfered with distinct investment-backed expectations"; and (3) "the character of the governmental action [e.g., physical invasion]." Penn Central, 438 U.S. at 124.

Plaintiff argues as plain error that the judge erred in failing to instruct the jury to "determine whether a taking had occurred upon consideration of [the] multiple factual factors" set forth in Penn Central. She contends that "lost value is only one factor in the determination. It is neither the sole nor critical factor." However, she does not argue on appeal, nor did she argue before the trial court,

A-1424-16T1

what specific other factors would have been appropriate. In fact, she only argued before the trial court that the jury should consider the "loss of use, lost rent." The court appropriately attempted to tailor the charge to that argument and the evidence by instructing the jury that to establish a partial taking the Sadejs must show there was a diminishment in the rental value of their property during the time period from April 2002 to July 2007. See Komlodi v. Picciano, 217 N.J. 387, 420 (2014).

The court also did not, as plaintiff argues, "hopelessly muddle[]" "the proper measure of damages into a critical element of the claim itself." Under Penn Central, 438 U.S. at 124, the "economic impact of the regulation on the claimant" is a factor in determining whether a taking has occurred. Further, the value by which the remaining part has been diminished as a consequence of a partial taking is also a measure of damages. See Borough of Harvey Cedars v. Karan, 214 N.J. 384, 417 (2013) (damages in partial taking calculated as difference between value of entire tract before taking and the value of remainder area after taking); see also Model Jury Charges (Civil), "Condemnation—Partial Taking (Severance Damages)" (1996).

Further, even if, as plaintiff argues, it would have been clearer to specifically refer to the Penn Central factors, that failure does not constitute

plain error because it had no clear capacity to bring about an unjust result. See Mason, 305 N.J. Super. at 495. The Sadejs did not establish that the issuance of the stop work order had an "economic impact" on the property. See Penn Central, 438 U.S. at 124. They presented no evidence as to the value of the property that was temporarily removed by the Borough, that is, the property they were unable to improve without "peril" from 2002 to 2007. In fact, after the court in the underlying action lifted the stop work order in 2002, the Sadejs chose to complete all of the improvements except the expansion of the garage. The Sadejs also presented no evidence as to the diminished rental value of the property. Plaintiff testified only as to rents she later received in 2009, 2014, and 2015, but presented no evidence she would have received a greater amount if the garage had been completed. The Sadejs could have called the realtors to establish that loss, but chose not to.

Plaintiff further argues that defendants waived their right to a jury charge on a partial taking because they did not submit the charge in accord with the "Firm Jury Trial" order. We disagree.

Defendants initially submitted a request to charge in accord with the order, which provided that:

On or before the scheduled trial date, all attorneys shall file and provide the trial judge and their adversaries with the following:

. . . .

Proposed jury charges, with legal authority, which charges must be <u>tailored to the facts</u> involved in the instant case. "Boilerplate" charges, those referenced in Model Charge 1.12, need not be submitted unless counsel believes a special instruction is warranted by the facts of the instant case. Any substantive issue which is not included in the requests to charge may, in the discretion of the [c]ourt, be deemed abandoned or may be viewed as an issue for determination by the [c]ourt rather than by a jury. Failure to tailor any request to charge to the facts involved in this case may be viewed as constituting a request for a general charge and a waiver of a request for a tailored charge.

Thereafter, immediately before closing arguments, defendants submitted a request to charge regarding the "partial temporary taking." The court rejected that charge, and charged the jury, without objection, as set forth above. In denying the Sadejs' motion for a new trial on this basis, the court found that

the issue of a partial taking evolved during the course of the trial. Defendants disputed that [p]laintiffs suffered <u>any</u> taking, whether complete or partial. Experts on behalf of both sides opined on the issue, both in their reports and in their testimony to the jury. This matter was hotly litigated during the trial and [p]laintiffs' argument that the Firm Trial Order precludes such issue is simply incorrect.

Rule 1:8-7(a) provides as follows:

> In Civil Cases. Either within the time provided by [Rule] 4:25-7 or thereafter but before the close of the evidence, as to issues not anticipated prior to trial any party may submit written requests that the court instruct the jury on the law as set forth in the requests. The requests shall make specific reference to the Model Civil Jury Charges, if applicable, or to applicable law. Copies of the requests shall be provided to all parties at the time they are submitted to the court. The court shall, on the record, rule on the requests prior to closing arguments to the jury.

The court rejected defendants' proposed charge and thus the Sadejs were not prejudiced by its late submission. Moreover, the court found the issue of a partial taking evolved during the trial, including by the Sadejs' proposed witnesses, and thus the Sadejs had ample notice of defendants' position on this issue. Further, the Sadejs agreed with the court's charge on this issue, which the court appropriately tailored to the evidence submitted at trial, and thus cannot show prejudice.

Next, plaintiff argues that defendants "effectively abandoned" the issue of a partial taking and thus this should have been an uncontested issue at trial. She contends that the question of whether or not diminished rental income controlled the issue of a taking had not been raised at any time in the case. However, as set forth above, the issue evolved over the course of the trial and neither party

41

clearly abandoned it. Moreover, the only evidence the Sadejs submitted in support of their partial taking claim was the rent they received, and thus they should not have been surprised when defendants proposed a jury charge on the issue, and the court tailored the instruction to that evidence. Further, the court did not, as plaintiff argues, find that defendants had effectively abandoned this issue in denying defendants' motion for judgment. Instead, the court denied defendants' motion for judgment on the 42 U.S.C. § 1983 claim.

Lastly, plaintiff argues that the court erred in denying her motion for a new trial on the same grounds as set forth above. A trial court shall grant a motion for a new trial "if, having given due regard to the opportunity of the jury to pass upon the credibility of the witnesses, it clearly and convincingly appears that there was a miscarriage of justice under the law." R. 4:49-1(a). We must adhere to essentially the same standard when reviewing the trial court's decision. Dolson v. Anastasia, 55 N.J. 2, 7 (1969). We find no plain error in the charge or in the procedures surrounding the charge. Accordingly, the court did not err in denying plaintiff's motion for a new trial.

IV.

Plaintiff argues, in the alternative, that she is entitled to attorney's fees for defendants' pursuit of "worthless claims" in the underlying action, and for the

42

fees incurred in the legal malpractice action. She claims defendants took the position that her claims were viable in the underlying action but argued "exactly the opposite" during the malpractice action. In support of that argument, plaintiff cites to French v. Armstrong, 80 N.J.L. 152, 155 (Sup. Ct. 1910). However that case did not hold that a plaintiff is entitled to attorney's fees for the pursuit of "worthless claims."

Further, defendants did not, as plaintiff argues, assert during the malpractice action that the 42 U.S.C. § 1983 and promissory estoppel claims were "worthless." Instead, defendants posited that the dismissal of those claims was immaterial because the claims that were preserved were more than sufficient to provide the Sadejs with their full measure of damages. Accordingly, both legally and factually, plaintiff's argument is without merit.

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

43